STATE OF NEBRASKA, APPELLEE, V. JOHN J. JOUBERT, APPELLANT.
399 N.W.2d 237

Filed December 29, 1986.   No. 84-842.

Thomas J. Garvey, Sarpy County Public Defender, Owen A. Giles, Special Assistant Public Defender, and, on brief, James P. Miller, for appellant.

Robert M. Spire, Attorney General, and Melvin K. Kammerlohr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

The appellant, John J. Joubert, entered a plea of guilty to two counts of first degree murder in violation of Neb. Rev. Stat. § 28-303 (Reissue 1985). Each murder count is a Class I or Class IA felony, punishable by either life imprisonment or the imposition of the death penalty. A three-judge panel was convened pursuant to the provisions of Neb. Rev. Stat. § 29-2520(2) (Reissue 1985). The panel held a hearing and concluded that a sentence of death should be imposed on each count. Joubert appeals to this court, raising issues with regard both to his conviction as well as to his sentence. We affirm.

The facts of the case are distressing at best, but must be related in some detail for an understanding of the case. While delivering newspapers in Bellevue, Nebraska, early on the morning of Sunday, September 18, 1983, Danny Joe Eberle, 13 years of age at the time, disappeared. Following a widespread search of the area conducted by local and area law enforcement personnel with the aid of the FBI, young Eberle's body was found several miles south of Bellevue, Nebraska, during the late morning hours of September 21, 1983. When his body was recovered, both his hands and feet were bound together. His mouth was covered with tape, and he was wearing only a pair of undershorts. A number of stab wounds appeared on his body, including one to the back of his neck. Additionally, a photograph in the record disclosed a gaping wound covering the full length of the back of the left thigh and approximately 11

inches wide, which appeared as if the flesh had been cut away clear to the bone. Although an investigation continued for some time, Danny Joe Eberle's murderer was not then apprehended.

A second young boy, Christopher Walden, then 12 years of age, in the early morning hours of Friday, December 2, 1983, also disappeared. His body was subsequently found by hunters during the late afternoon hours of December 5, 1983, in a small wooded area located at the intersection of Giles and Cornhusker Roads in Sarpy County, Nebraska. He, too, was clad only in a pair of undershorts. His body exhibited a number of stab wounds. Also, his throat was slashed, and the full length and breadth of his chest and abdomen was covered with what looked like a representation of a large plant, including the stem and seven leaves. This figure appeared to have been rather carefully and deliberately carved into the skin and flesh with a sharp knife. Further investigation continued, and still no one was apprehended.

Then, on the morning of January 11, 1984, at approximately 8:30 a.m., a teacher at the Aldersgate Preschool in northeast Sarpy County was preparing for the day. She observed a car driven by a person she would later identify as Joubert approach close to the windows of the school. He stopped momentarily, looked at the teacher, and then turned around and drove off. Several minutes later, she noticed he had driven back. He did not drive up to the window this time but, rather, sat a short distance from the school, looking at her for a few seconds.

Concerned, she wrote down the license plate number of the vehicle and watched it drive away. A few minutes later, the vehicle returned and drove up to the building again. Joubert got out of the vehicle and came to the door of the school, asking for directions. She gave him the directions he requested. Claiming he could not understand her directions, he asked to use the phone. She said there was no phone inside the school. At that time he pushed her back inside the room and said to her, "Get back in there or I'll kill you." The teacher pushed Joubert out of her way and ran by him down the street to a nearby home where she called the police.

She gave the police the license number of the car she had seen

and also indicated that the person in the car looked like the composite sketch of the suspected killer of both young boys that had appeared for approximately a month in the local newspaper.

The police conducted a preliminary investigation and, by matching license numbers, picked up Joubert, a member of the U.S. Air Force, at Offutt Air Force Base located in Sarpy County.

Initially, the officials who questioned Joubert talked to him only about the incident at the Aldersgate Preschool. Soon thereafter, however, Joubert made some spontaneous admissions to those questioning him concerning the Eberle/Walden homicides. Eventually, Joubert gave a tape-recorded confession in which he filled in those facts of the Eberle and Walden slayings that the investigators had been unable to find.

Joubert told the officers that he was driving around Bellevue in his personal car, a 1979 Chevrolet Nova, in the early morning hours of September 18, 1983. He pulled up to a convenience store to get something to drink. At the time, it was still dark. He was leaning against his car, sipping his drink in the parking lot of the store, when he noticed a young boy fixing his newspapers for the day. When the boy left the parking lot, Joubert followed him. He drove past the boy and parked in a parking lot two blocks further. He got out of his car, carrying rope, some tape, and a knife, and hid behind a car or tree, where he waited. As Eberle was walking back to his bike after delivering a paper, he spoke to Joubert, who returned the greeting. Then, as Eberle turned his back on Joubert to get on his bike, Joubert grabbed him, put his hand over his mouth and a knife to his throat, and told him to come with him and not to make any sounds. Eberle did not struggle and returned to the parking lot with Joubert. Joubert ordered Eberle to lie down on his stomach next to the car. It was still dark and no one could see them. When Eberle lay down, Joubert tied his hands behind his back and then tied his feet together and placed some tape over his mouth. When all of this was done, Joubert picked Eberle up and placed him in the trunk of the car and closed the top. He then drove off.

Joubert told the officers he then drove to a somewhat

secluded place south of Bellevue, where he took Eberle out of the trunk and laid him in a ditch on the side of the road. After closing the trunk of the car, Joubert carried Eberle about 10 or 20 feet off the road into a cornfield. He told Eberle to roll over on his stomach. When Eberle did so, Joubert untied Eberle's hands, told him to remove his shirt, and told him to roll over on his back. Joubert then untied Eberle's feet and took his pants off. At this time the tape was beginning to come off of Eberle's mouth, just enough for him to talk. Joubert again pulled out the knife, and Eberle pleaded, "Don't, please don't kill me." Eberle struggled a bit, so Joubert stabbed him in the back. At this point Eberle told Joubert that if he, Joubert, would take Eberle to the hospital, Eberle would not say anything. Joubert said he did not believe Eberle, and, so, at that time he stabbed him again a couple of times. He then sliced the back of Eberle's neck. When Eberle ceased moving, Joubert, to make sure that he was dead, sliced the back of Eberle's left leg. The leg did not bleed. Joubert dragged Eberle's body a few yards away from the road and concealed it in the weeds. He wiped the knife clean with Eberle's shirt, returned to his car, and went back to his barracks, where he napped.

Dr. Blaine Roffman, a pathologist, conducted the autopsy on Danny Joe Eberle. He testified that there were a total of 11 stab wounds on Eberle's body. Eight of those wounds were penetrating stab wounds, three less deep. More importantly, however, Dr. Roffman testified that 9 of the 11 wounds were inflicted before death. Dr. Roffman was certain that death was not instantaneous. In addition, there was some hemorrhaging on the top of the skull, which must have resulted from some type of traumatic blow to the head. This very likely occurred when Eberle was being jostled about in the trunk of Joubert's car.

Dr. Roffman concluded, "I think he was aware — the victim was aware of the circumstances, and in my opinion, that was undue pain and suffering."

The record further discloses that Joubert additionally related to the investigating officers that on the morning of December 2, 1983, he again left his barracks between 6 and 6:30 a.m. and began cruising in his car. He had taken from his locker the same

knife with which he had murdered Danny Joe Eberle.

He first drove around bus stops, looking for people. Not finding anyone alone, he began to drive past the neighborhood schools. In the area of the Pawnee school, he spotted Christopher Walden walking to school. He parked his auto at the intersection of 48th and Margo and waited until Walden had walked very close to his car. Joubert then got out of the car, walked toward Walden, and got behind him. When he was very near to Walden, he called to him and told him to stop for a minute. There was no one else around. Joubert showed Walden his knife but did not pull it out. Joubert told Walden to come with him and to be quiet or Joubert would kill him. When Walden looked uncertain for a moment, Joubert put his hand on Walden's shoulder and led him to the car. When they got to the car, another car passed, so Joubert pretended that he and Walden were having a conversation. At that point Joubert told Walden to get into the car and to lie down on the floor in the front passenger seat. As Joubert started to drive off, Walden began crying. Joubert related to the investigators, "I was driving down Margo and I was thinking about letting him go . . . . He was on the floor in the front passenger seat. I just figured that if I did let him go he would probably tell someone and then what would happen to me."

Joubert drove Walden to another isolated, secluded spot. After making sure there was no one else in the area, he ordered Walden out of the car. It was cold and there was snow on the ground. They began walking along some railroad tracks. Joubert promised Walden that if Walden just followed orders and did everything that Joubert told him to do, nothing would happen to him. He told Walden to strip down to his underwear and lie down on his back. Evidently, because of the snow, Walden balked at this command, and, so, according to Joubert, he placed his hands on Walden's shoulders, around his neck, and "encouraged" him to lie down on his back. When he had done that, Joubert knelt on Walden's chest and started strangling him. Walden began struggling and, according to Joubert, looked like he was in pain. At that point, as Walden struggled to get away, Joubert took out his knife and stabbed Walden a couple of times in the back and then sliced his throat.

When Joubert thought that Walden was dead, he sliced Walden's stomach a couple of times just to make sure. Joubert then left the area, drove straight to the barracks, threw the knife into a dumpster, and went back to his room, where he went to sleep.

Dr. Jerry Wilson Jones, another pathologist, conducted the autopsy on Christopher Walden. According to Dr. Jones, Walden was stabbed a total of seven times. Two of the wounds had penetrated deeply, five had not. Dr. Jones testified that death did not occur instantaneously but that Walden was alive and cognizant for a period of time and then gradually lapsed into a coma and eventually died. In Dr. Jones' opinion, Walden could have been tortured in the manner in which he was killed. He further believed that Walden suffered during this period of time.

Joubert contends that three errors were committed by the district court prior to sentencing and that six errors were committed by the sentencing panel following his plea of guilty. With regard to the first group of assigned errors, Joubert maintains, in essence, that his pleas of guilty were not made freely, voluntarily, and knowingly in that he was induced by the district judge to enter pleas of guilty. The errors allegedly committed by the sentencing panel were (1) in finding, with respect to the Walden murder, that Joubert had a substantial history of serious assaultive or terrorizing criminal activity; (2) in finding that both murders were committed in an effort to conceal his identity; (3) in finding that both murders were "especially heinous, atrocious, cruel, and [sic] manifested exceptional depravity by ordinary standards of morality and intelligence"; (4) in finding sufficient aggravating circumstances existed to justify the imposition of the death penalty; (5) in failing to find mitigating circumstances sufficient to outweigh the aggravating circumstances; and (6) in limiting the mitigating effects of Joubert's guilty pleas when considering aggravating and mitigating circumstances.

We turn first to the questions involving whether the pleas made by Joubert and accepted by the court were made freely, voluntarily, and knowingly and whether the district court made promises which misled Joubert regarding either the pleas or the

sentences. The law regarding the requirements which must be met before a guilty plea in a criminal case can be accepted is clear and uncontroverted. In *State v. Turner*, 186 Neb. 424, 427, 183 N.W.2d 763, 766 (1971), in discussing the necessary standard for accepting a plea of guilty, we said: " 'The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " The record must show that a plea of guilty was made intelligently, voluntarily, and understandingly. Further, the plea must be based upon sufficient facts to justify the court's finding the defendant guilty beyond a reasonable doubt. When that appears, the court may accept the plea.

In *State v. Jackson*, 220 Neb. 656, 658, 371 N.W.2d 679, 681 (1985), we recently observed: " 'Before accepting a guilty plea a judge is expected to sufficiently examine the defendant to determine whether he understands the nature of the charge, the possible penalty, and the effect of his plea.' "

In the instant case Joubert argues that, sometime before entering his pleas, the trial court promised him a hearing on a motion to suppress and failed to keep that promise. Therefore, Joubert argues, he is entitled to have his pleas withdrawn and the case remanded for trial. Our close examination of the record fails to support Joubert's contention as to what in fact took place and indicates beyond question that Joubert freely, voluntarily, and intelligently entered his pleas of guilty to the two charges of murder.

The record discloses that after pleas of not guilty were entered, Joubert's attorney filed a motion to suppress the statements previously given by Joubert to the authorities. The district court deferred hearing the motion and advised Joubert's attorney on the record that "any hearings on alleged statements or confessions would be deferred until such time as a jury in the case would be empaneled and sequestered." Apparently, the district court was concerned that holding a suppression hearing before the jury was empaneled and sequestered would result in undue pretrial publicity and would interfere with Joubert's opportunity for a fair trial. Joubert's lawyer was somewhat concerned about delaying the hearing and indicated that fact to

the district judge. Apparently, his concern was that he felt he could not encourage Joubert to consider any plea agreement until he knew whether the statements would be admitted or suppressed. The district court advised Joubert's attorney, on the record, that

> if in fact there is ever a plea agreement that you may enter into where a plea of guilty to some charges or lesser charges is offered, at that point in time what I would do is not receive it, but consider your motion to suppress in conjunction with the hearing on the underlying facts to support the plea agreement.

The district court also advised Joubert's attorney that if, at such a hearing, the court determined that the statements should be suppressed, Joubert would be permitted to withdraw his pleas. Though Joubert's attorney appeared to be reluctant, he ultimately agreed with the district court that such procedure could be followed.

Joubert argues that this, in some way, was a promise relating to a plea bargain and was intended to induce Joubert to enter pleas of guilty. The record does not support that contention. The district court was not encouraging Joubert to do anything, but merely was advising his counsel that if Joubert stayed with the entry of pleas of not guilty and a jury trial was required, a hearing on the motion to suppress would be held after the jury had been selected and sequestered. If, however, Joubert waived the jury trial and tendered pleas of guilty pursuant to a plea bargain, before the pleas of guilty would be accepted by the district court a hearing on the suppression motion would be conducted. The district court's explanation of the procedures to be followed was clearly in the alternative and was intended to explain what would be done, depending upon what Joubert elected to do. The choices were still clearly Joubert's, and the explanation by the district court cannot be said to have been a promise conditioned upon pleas of guilty. Joubert was told he could have a hearing on the suppression motion before trial, regardless of what pleas he entered.

The record discloses that subsequently, on July 3, 1984, pursuant to a plea bargain whereby the State dismissed two kidnaping charges and two counts of using a knife to commit a

felony, Joubert pleaded guilty to the first degree murder charges then pending. The decision to plead guilty was clearly Joubert's, and nothing in the record suggests that Joubert's decision had anything to do with earlier statements made by the district court regarding the suppression hearing.

In any event the record discloses that, before accepting the pleas of guilty, the district court examined Joubert at great length with regard to both the pleas and the pending motion to suppress. The record discloses that the district court asked Joubert a series of questions necessary to ascertain whether the pleas were being made freely, voluntarily, intelligently, and knowingly. The district court further advised Joubert that, by tendering the pleas of guilty, Joubert would waive any technical defects in the proceedings up to the time of the pleas and would further waive any pending motions that might have been of benefit to Joubert. Specifically, the court said:

> THE COURT: All right. And now more specifically, Mr. Joubert, let me ask you, do you understand there is a motion pending to suppress statements or confessions that you had allegedly made at the time of your arrest? Do you understand that if I accept the pleas of guilty, that that motion likewise is gone and you can never raise that again as an issue?
>
> MR. JOUBERT: I understand.

Neither Joubert nor his counsel in any way indicated to the court that he did not intend to waive the motion to suppress or desired at that point to have a hearing on the motion before the court accepted the pleas of guilty.

The record further reflects that the State established a factual basis for Joubert's pleas. In particular, the State described in detail the facts from the time of Joubert's apprehension up until the time of his confession. No objections were made by Joubert or his counsel to any of the facts recited by the State. When the State completed advising the court of the facts, the district judge again asked Joubert several questions. In particular, he asked:

> THE COURT: Okay. I touched earlier, Mr. Joubert, upon the various motions that you would waive if I accept the plea of guilty, and then Mr. Wellman related fully and I

have marked in evidence and received Exhibits 32 and 33, which as recited and then related in substance, that those are full confessions to police officers relating to the murders of these two boys. Are you satisfied in your own mind that you gave those statements to the officers voluntarily?

MR. JOUBERT: Yes, Your Honor.

THE COURT: Did they make any promises to you before you gave those statements?

MR. JOUBERT: No, Your Honor.

THE COURT: Did they indicate that you were under suspicion or under arrest for these crimes and that you had the right to have counsel present?

MR. JOUBERT: Yes, they did.

THE COURT: And did they indicate to you that if you could not afford counsel, the Court would appoint one for you before there would be any further questioning?

MR. JOUBERT: Yes, they did.

THE COURT: Did they indicate to you that you had a right to remain silent and not answer any of their questions?

MR. JOUBERT: Yes.

THE COURT: And prior to the time they even spoke with you did they identify themselves as law enforcement officers, be it police, sheriff's officer or FBI?

MR. JOUBERT: Yes, they did.

Further, the district court asked Joubert's counsel whether he was satisfied that the statements or confessions or admissions that had been made by Joubert were voluntarily made and that Joubert was accorded his constitutional rights prior to making those. Counsel answered, "Yes, Your Honor. I think they're clearly admissible." It was only then that the district court accepted each plea of guilty and found Joubert guilty of murder in the first degree on both counts.

Joubert's argument that there was some promise of a hearing which induced him to enter pleas of guilty to murder or that the alleged promises made by the district court which induced him to enter his pleas were unfulfilled is without any basis in fact. Not only does the record make it clear that Joubert freely and

voluntarily waived the right to a hearing on the motion to suppress, it is also clear that, though Joubert had an opportunity to present evidence to the district court regarding the confessions, he freely and voluntarily admitted that the confessions were constitutionally obtained and knowingly and voluntarily given. Had Joubert or his counsel wished to have a separate *Jackson v. Denno*-type hearing concerning the admissibility of the confessions, he was obligated to advise the court when the district court inquired as to Joubert's understanding of the guilty pleas. It is inconsistent for Joubert, on the one hand, to admit the confessions were freely and voluntarily given while, on the other hand, maintaining that a hearing to suppress the confessions would have been successful.

It is difficult to imagine what evidence could have been presented to the district court which would have caused the district court to suppress the confessions in light of the statements and admissions made by both Joubert and his attorney regarding the confessions. There is no basis for this assignment, and it is overruled.

Joubert further argues that the district court promised him life sentences in return for his pleas of guilty, and failed to fulfill that promise. Again, the record does not support that contention. The record discloses that *after* Joubert tendered his pleas of guilty and before the district court accepted the pleas, the district court said:

> THE COURT: You understand . . . that *some* consideration would be given by myself or the sentencing judges to the money-saving expense of trial . . . that comes with any pleas of guilty. . . .
>
> MR. JOUBERT: Yes.

(Emphasis supplied.) The words themselves do not appear to have been a promise or an inducement in any manner to the previous tender of guilty pleas; the plain meanings of the words provide nothing more than a statement that "some consideration" would be given. While it may have been better had the district court not attempted in any manner to advise as to the factors to be considered, in view of the fact that the hearing on sentencing had not yet been held, advising counsel

and Joubert that "some consideration" would be given by reason of the pleas of guilty falls far short of any suggestion of a promise or inducement to enter the pleas of guilty. The record clearly establishes that Joubert's pleas of guilty were made freely, voluntarily, intelligently, and understandingly and free of any promises or inducements.

Furthermore, the record discloses that the sentencing panel did consider that Joubert's pleas of guilty were mitigating factors and did give "some consideration" to that fact. The sentencing panel, after giving some consideration to the pleas of guilty, found that the mitigating circumstances did not approach or outweigh the aggravating circumstances. Any purported agreement was kept. The pleas were properly accepted, and the motion to withdraw the pleas was properly denied.

That leaves us with the errors relating to the sentences of death. As we earlier indicated, Joubert has raised six alleged errors in connection with the sentences. We shall address them individually in the order in which they are raised.

Neb. Rev. Stat. § 29-2522 (Reissue 1985) requires the sentencing court to proceed as follows:

> After hearing all of the evidence and arguments in the sentencing proceeding, the judge or judges shall fix the sentence at either death or life imprisonment, but such determination shall be based upon the following considerations:
>
> (1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death;
>
> (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
>
> . . . .

Neb. Rev. Stat. § 29-2525 (Reissue 1985) requires the Supreme Court to review all cases in which the death penalty has been imposed.

What are aggravating and mitigating circumstances is, to a

large extent, prescribed by statute, although, as noted above, the courts are required to consider any evidence in mitigation. See *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982). Furthermore, the aggravating circumstances must be proved beyond a reasonable doubt. See, *State v. Palmer, ante* p. 282, 399 N.W.2d 706 (1986); *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984). What constitutes aggravating circumstances is not left to the discretion of either the sentencing court or the Supreme Court but, instead, is set out by statute in detail. Neb. Rev. Stat. § 29-2523(1)(Reissue 1985) defines aggravating circumstances as follows:

(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity;

(b) The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime;

(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;

(e) At the time the murder was committed, the offender also committed another murder;

(f) The offender knowingly created a great risk of death to at least several persons;

(g) The victim was a law enforcement officer or a public servant having custody of the offender or another; or

(h) The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws.

The mitigating circumstances, as defined by § 29-2523(2), are as follows:

(a) The offender has no significant history of prior criminal activity;

(b) The offender acted under unusual pressures or influences or under the domination of another person;

(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;

(d) The age of the defendant at the time of the crime;

(e) The offender was an accomplice in the crime committed by another person and his participation was relatively minor;

(f) The victim was a participant in the defendant's conduct or consented to the act; or

(g) At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication.

These guidelines exemplify the type of standards which must be followed in order to avoid the indiscriminate application of the death penalty. Absent such guidelines, the imposition of the death penalty in a particular case must be set aside as being in violation of the U.S. Constitution as declared by the U.S. Supreme Court. See, *State v. Palmer, supra; Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972).

With that background we review the record to determine whether the aggravating circumstances were established by evidence beyond a reasonable doubt.

The sentencing panel found that with regard to the Eberle crime, count I, there existed aggravating circumstances (1)(b) and (1)(d) and mitigating circumstances (2)(a) and (2)(c). The sentencing panel further found that because Joubert entered a plea of guilty, there existed an additional mitigating circumstance. With regard to the crime involving the Walden youth, count II, the panel found existing aggravating circumstances (1)(a), (1)(b), and (1)(d) and mitigating circumstance (2)(c), plus, again, the fact that Joubert pleaded guilty.

Once the existence of one or more aggravating circumstances has been found to exist, § 29-2522 requires not a mere counting of aggravating and mitigating circumstances but, rather, a reasoned judgment as to what factual situations require the imposition of death and which of those can be satisfied by life

imprisonment in light of the totality of the circumstances present. See, *State v. Palmer, ante* p. 282, 399 N.W.2d 706 (1986); *State v. Reeves,* 216 Neb. 206, 344 N.W.2d 433 (1984); *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977). In reviewing and balancing the aggravating circumstances against the mitigating circumstances, the sentencing panel concluded that the aggravating circumstances outweighed the mitigating circumstances and that Joubert should be sentenced to death for both murders.

In that regard Joubert maintains first that the evidence was insufficient to establish beyond a reasonable doubt the existence of aggravating circumstance (1)(a) in connection with the Walden murder (the second of the two), in that Joubert had a substantial history of serious assaultive or terrorizing criminal activity. The record establishes beyond a reasonable doubt that, at the time of the Walden murder, Joubert had "a substantial history of serious assaultive or terrorizing criminal activity."

The facts in this case with regard to this issue are nearly identical to the facts in *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982). In that case Carey Dean Moore was charged with the murders of two Omaha cabdrivers, 5 days apart. We held that the fact that Moore had killed someone prior to the murder for which he was sentenced to death was sufficient to establish the existence of an aggravating circumstance found in § 29-2523(1)(a) and that the sentencing panel properly considered this earlier murder in accordance with our prior interpretation in both *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), and *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977).

Joubert next maintains that the evidence was insufficient to establish beyond a reasonable doubt the existence of aggravating circumstance (1)(b) in either case. Section 29-2523(1)(b) provides: "The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." We believe that the record establishes beyond a reasonable doubt that, in addition to whatever other reasons Joubert may have had for murdering, Joubert murdered both Eberle and Walden to conceal his identity as the perpetrator of the crime of

kidnaping. The evidence is overwhelming in that regard.

With regard to the Eberle boy, Joubert admitted that after he had first stabbed Eberle in the back, Eberle asked that he be taken to a hospital and that if Joubert would take him to the hospital, he, Eberle, would not say anything. Joubert said, "I didn't believe him so I stabbed him again a couple of times." Obviously, he did not believe that Eberle would not disclose Joubert's identity; therefore, it is clear that, despite any other reasons which may have been involved, one of the reasons for committing the murder was to conceal his identity as the perpetrator of the crimes of kidnaping and assault.

To the same effect, when speaking of the Walden murder, Joubert stated:

> As I started up the car and I started driving off he started crying. I was driving down Margo and I was thinking about letting him go. . . . He was on the floor in the front passenger seat. I just figured that if I did let him go he would probably tell someone and then what would happen to me.

Again, this is clear evidence that Joubert concluded that he could not let Walden go for fear that he would be identified, and, therefore, the murder was to conceal his identity as a murderer and kidnaper. It is clear that the panel was correct when it found that aggravating circumstance (1)(b) existed in both murders.

Next, Joubert maintains that the sentencing panel erred in finding that both components of § 29-2523(1)(d) applied, in that these murders were neither "especially heinous, atrocious, cruel" nor "manifested exceptional depravity by ordinary standards of morality and intelligence." In support of his position Joubert argues that this case is identical to *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985), wherein this court held that the murder was not "especially heinous, atrocious, cruel." To argue that the murders in the present case were identical to the murder in *Hunt* is to ignore the facts. The facts in the present case are clearly otherwise.

The sentencing panel in this case found with regard to § 29-2523(1)(d):

> The murder was especially heinous, atrocious, cruel, or

manifested exceptional depravity by ordinary standards of morality and intelligence. (Section 29-2523(l)(d)).

This aggravating circumstance describes in the disjunctive two separate situations which may operate in conjunction with, or be independent of, one another. The first is where the murder is especially heinous, atrocious, or cruel. In short, the first situation must be looked upon through the eyes of the victim and should be applied to cases where torture, sadism, or the imposition of extreme suffering exists. State v. Stewart, 197 Neb. 497, 250 N.W. 2d 849; State v. Rust, 197 Neb. 528, 250 N.W. 2d 867; and State v. Moore, 210 Neb. 457, 316 N.W. 2d 33.

Upon his abduction, Danny Joe Eberle's hands and feet were tightly bound, surgical tape was placed over his mouth and he was put in the trunk of defendant's automobile. He was then transported to the actual scene of the homicide several miles away and removed from the trunk of the automobile to face his abductor. His hands and feet were untied, and then retied in sequence in order for him to follow the defendant's instructions on removing his outer clothes. It was during this period of time that the surgical tape covering the victim's mouth had worked loose, and he asked the defendant if he was going to die. When the defendant replied, "Yes", Danny attempted to roll away, the only means left to resist or escape. Defendant then inflicted the first stab wound. The victim then asked the defendant to take him to a hospital, and he (Danny) would not tell anyone. Defendant did not believe this statement, and proceeded with his murderous plan.

Danny Joe Eberle's death resulted from loss of blood caused by one or more of nine antemortem stab wounds. Two additional wounds, one a deep wound to the left thigh, and one a deep wound to the left shoulder, were inflicted postmortem by the defendant. Dr. Roffman expressed an opinion that Danny Joe's death could have been directly caused by either the stab wounds in the left chest portion, or the slicing type wound to his neck. He further testified that death was not instantaneous, but the

victim would have been aware and lived at least three to four minutes. Dr. Roffman was of the further opinion these wounds caused undue pain and suffering to Danny Joe Eberle.

Christopher Walden was abducted as he walked to school on the morning of December 2nd. He was forced into defendant's car, and told to lie on the floorboard. He began to cry, and defendant thought of releasing him. Defendant realized if he released Christopher it would cause him, the defendant, trouble. He then determined to carry out his plan as quickly as possible and immediately drove several miles to the area where Christopher's body was found three days later. Upon arriving, defendant made Christopher walk to the murder site, and disrobe to his undershorts.

He then had the boy lie down and he began to manually strangle him. When he was unable to complete his gruesome task in this manner, he drew his knife and commenced a most horrid final assault.

Christopher Walden died from loss of blood caused by one or more of seven stab wounds and a large cutting wound on his neck. There were six or seven additional cutting wounds inflicted upon Christopher Walden's body postmortem, across the chest and stomach. Of the seven stab wounds inflicted antemortem, Dr. Jones, the pathologist conducting the autopsy, pointed out that five of these did not penetrate deeply, yet the body tissue was not thick at those areas. Dr. Jones' opinion was that Christopher's death was not instantaneous, but that because of these five shallow stab wounds, he could well have been tortured. Dr. Kentsmith testified in his opinion both of these young boys would have been quite humiliated by undressing in front of the defendant at his direction, and further testified upon their abduction they would have felt an intense sense of terror, overwhelming fear, helplessness, anxiety, and a sense of impending doom that they would not survive. He testified this would be an overwhelming and very painful psychological event in a person's life.

With respect to the second clause of this aggravating circumstance, the crime must be viewed to determine the defendant's state of mind as manifested by his conduct. The manifestation of "exceptional" depravity by ordinary standards of morality and intelligence indicates a state of mind "totally and senselessly bereft of any regard for human life". State v. Holtan, 197 Neb. 544, 250 N.W. 2d 876; State v. Peery, 199 Neb. 656, 261 N.W. 2d 95; State v. Otey, 205 Neb. 90, 287 N.W. 2d [36]; State v. Harper, 208 Neb. 568, 304 N.W. 2d 663; and State v. Moore, 210 Neb. 457, 316 N.W. 2d 33.

The defendant herein planned these abductions and murders far in advance, with the only missing element the actual identity of the victims. The murders were to be repetitive, presumably continuing as long as the defendant felt a need to satisfy his intellectual or sexual curiosity or urges, and the victims selected by the defendant would, by his fantasized standards, be somewhat defenseless and consist of prepubescent boys or women fitting the pictorial description gleaned from detective magazine covers. . . . In short, the evidence is overwhelming that each of these murders were [sic] "totally and senselessly bereft of any regard for human life".

We recognize that all murders may be characterized as atrocious and cruel, and further recognize there must, of necessity, be some interval of time between even the most savage of knife attacks and a resulting death. We, nevertheless, conclude this aggravating circumstance is applicable with respect to both clauses, recognizing the evidence and factors on the second clause of the aggravating circumstance far outweigh those under the first clause.

We conclude and find beyond a reasonable doubt this aggravating circumstance exists in both crimes for which the defendant is to be sentenced.

We agree with each of the factual findings made by the three-judge panel as set out above. We also agree with the conclusions of law as to the construction of § 29-2523(1)(d).

As we stated in State v. Palmer, ante p. 282, 314, 399

N.W.2d 706, 728 (1986):

> We note that the word *or* separates "especially heinous, atrocious, cruel" from "manifested exceptional depravity by ordinary standards of morality and intelligence." Thus, aggravating circumstance (1)(d) of § 29-2523 describes in the disjunctive at least two distinct components of an aggravating circumstance which may relate to a murder and which "may operate in conjunction with or independent of one another." *State v. Moore*, 210 Neb. 457, 470, 316 N.W.2d 33, 41 (1982). See, also, *Jones v. Commonwealth*, 228 Va. 427, 323 S.E.2d 554 (1984). The presence of any of the components will sustain a finding that aggravating circumstance (1)(d) exists. See *State v. Correll*, 148 Ariz. 468, 715 P.2d 721 (1986). See, also, *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983), *cert. denied* 461 U.S. 971, 103 S. Ct. 2444, 77 L. Ed. 2d 1327 (regarding "heinous, cruel, or depraved," such statutory expression is in the disjunctive, " 'so either all or one could constitute an aggravating circumstance' ").

The evidence establishes beyond a reasonable doubt that each of the murders in this case was a "conscienceless or pitiless crime which [was] unnecessarily torturous to the victim" and, thus, that each of the murders was "especially heinous, atrocious, cruel" as required by § 29-2523(1)(d). *State v. Palmer, supra* at 315, 399 N.W.2d at 729.

The evidence further establishes beyond a reasonable doubt that each of the murders in this case "manifested exceptional depravity by ordinary standards of morality and intelligence."

As stated in *State v. Palmer, supra* at 320, 399 N.W.2d at 731-32:

> "[E]xceptional depravity" in a murder exists when it is shown, beyond a reasonable doubt, that the following circumstances, either separately or collectively, exist in reference to a first degree murder: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim. . . . Consequently, where one or more of those five factors are present, there may be a finding of

"exceptional depravity" concerning a first degree murder.

In this case the evidence establishes beyond a reasonable doubt that the defendant committed each murder with relish, inflicted gratuitous violence on the victim beyond that necessary to inflict death, the crimes were utterly senseless, and the victims were completely helpless.

Additionally, the murders were coldly planned as part of a repetitive program of self-gratification, involving immature victims selected on the basis of their availability at a time when the likelihood of detection was slight. See *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982).

Defendant's urge for self-gratification was described by the psychiatrists as his need to satisfy his intellectual or sexual curiosity. In an interview with Dr. Kentsmith, Joubert stated that he wanted to know "what it was like to see someone die."

The intellectual approach defendant took to the two murders involved is typified by several facts. Joubert told each of the psychiatrists in the case that, as he expressed the facts to Dr. Kentsmith, he frequently "had set my alarm clock to get up in the morning and to go out and do it [commit a murder]." Joubert told Dr. Kentsmith that 9 out of 10 times, after his alarm clock went off, Joubert would turn the alarm off and go back to sleep. He indicated that on some occasions he would get up and go looking for possible victims.

Dr. Kentsmith concluded that the psychological testing of Joubert shows a personality type which operated in an "amoral style" with an "inability to postpone gratification." Dr. Kentsmith concluded that Joubert killed for "intellectual curiosity," not for "sexual pleasure."

The circumstances in this case demonstrate beyond a reasonable doubt that the murders "manifested exceptional depravity by ordinary standards of morality and intelligence." *State v. Palmer, ante* p. 282, 399 N.W.2d 706 (1986).

The remaining assigned errors may be considered together. They are, in effect, that the mitigating circumstances outweigh the aggravating circumstances.

The record establishes no mitigating circumstances in either murder other than those found by the sentencing panel. However, we examine in some further detail the finding by the

panel that mitigating circumstance (2)(c) existed as to each murder.

As set out above, § 29-2523(2)(c) defines as a mitigating circumstance the fact that "[T]he crime was committed while the offender was under the influence of extreme mental or emotional disturbance." While we agree that subsection (2)(c) may be considered as established for purposes of sentencing, the weight to be given it is sharply diminished by the testimony of Dr. Kentsmith. Dr. Kentsmith testified that Joubert was not acting under such an influence that he could not have changed his behavior at the last moment before he actually killed the two boys.

Dr. Kentsmith testified that if Joubert had such an uncontrollable impulse, his actions "would be something that he would not plan out, that it would be something that under the influence of such strong emotion that it would occur at such a random, bizarre fashion that he would do it without any planning, without any premeditation, without any thought; just do it."

At another point Dr. Kentsmith testified:

Well, an irresistible impulse is something that has to do with a person who is acting at the moment and behaving in such a way that even if a policeman was standing beside him, that he would go ahead and do what he's intending to do. I have not been able to see anything in the examination or any of the reports that have been given to me to indicate that he wasn't able to carefully plan and orchestrate what he was doing to some degree. That doesn't mean that he couldn't do it, that he still didn't want to do it then, but the point was that he was able to control that.

We find Dr. Kentsmith's analysis to be convincing. We therefore determine that while some weight should be given to (2)(c), that weight must be considered in the light of Dr. Kentsmith's finding that Joubert could control the mental stress he had.

The balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors. As we observed in State v.

*Stewart,* 197 Neb. 497, 518, 250 N.W.2d 849, 862 (1977), quoting from *State v. Dixon,* 283 So. 2d 1 (Fla. 1973):

"It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of· death and which can be satisfied by life imprisonment in light of the totality of the circumstances present. Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in Furman v. Georgia, supra, can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all."

From our examination of the aggravating circumstances and the mitigating circumstances, we conclude that the aggravating circumstances which were proven to exist so far outweighed the mitigating circumstances that the imposition of the death penalty was appropriate and not arbitrary. Sufficient aggravating circumstances existed to justify the imposition of sentences of death, and the mitigating circumstances did not approach or exceed the aggravating circumstances.

The assignments of error raised by Joubert in regard to the sentences by the sentencing panel are, therefore, overruled.

That leaves us with but one final act to perform, the proportionality review required by the provisions of Neb. Rev. Stat. § 29-2521.03 (Reissue 1985). This statute requires the Supreme Court to determine the propriety of the death sentence in a case in which it has been imposed by comparing the sentence with previous cases involving the same or similar circumstances.

We have determined that the purpose of that statute is to

ensure that no sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances and that the review should include only those cases in which the death penalty was imposed. *State v. Palmer, ante* p. 282, 399 N.W.2d 706 (1986).

We have compared the facts and circumstances of this case with those of all the applicable cases in which the death penalty was imposed, as required by *State v. Palmer*. We find that the sentences imposed in this case are no greater than nor disproportionate to the sentences imposed in any other case with the same or similar circumstances.

The judgments are affirmed.

AFFIRMED.

KRIVOSHA, C.J., concurring in the result.

I concur in the result reached by the majority in this case. I believe, beyond question, that the facts of this case satisfy the requirements of Nebraska law and justify the sentencing panel's sentence of death. I am not, however, able to adopt in its entirety all of the language of the majority, and for that reason I concur separately.

As observed by the majority, Joubert maintains that the sentencing panel erred in finding that Neb. Rev. Stat. § 29-2523(1)(d) (Reissue 1985) applied, in that these murders were not "especially heinous, atrocious, cruel, and [sic] manifested exceptional depravity by ordinary standards of morality and intelligence." In support of his position Joubert argues that this case is identical to *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985), wherein this court held that the murder was not especially heinous and that, therefore, the death penalty could not be imposed.

Joubert, like so many, misread our holding in *State v. Hunt, supra*, and fails to understand the distinction to be made between this case and *Hunt*. The language of the specific aggravating circumstance § 29-2523(1)(d) reads as follows: "The *murder* was *especially* heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." (Emphasis supplied.) Why the Legislature chose to add the word "especially" to modify "heinous" is not clear. However, a number of other

jurisdictions, including Alabama, Arizona, Florida, Louisiana, Mississippi, North Carolina, and Wyoming, have used virtually identical language in their death penalty statutes, and states such as Georgia have used similar language. The critical words, as noted by the U.S. Supreme Court and several state courts, as well as by this court, are "murder" and "especially." As we noted in *State v. Hunt, supra* at 725, 371 N.W.2d at 721: "In order for aggravating circumstance (1)(d) to be present, the method of killing must entail something more than the ordinary circumstances which attend any death-dealing violence." As limited by the Legislature, the *murder* must not only be *heinous*, which means horrible, but it must be "especially" heinous, which means horribly horrible. There is no requirement in the Constitution which requires this exact standard. Nevertheless, the Legislature has imposed such a standard upon the courts, and we are duty-bound to follow the limitation. The Legislature alone prescribes the conditions under which the death penalty may be imposed.

*State v. Hunt, supra,* was certainly not the first or only case to use this definition of "especially heinous," and it, in fact, reflects the nearly unanimous position taken by courts which have considered the question. Its holding is consistent with our earlier holding in *State v. Reeves,* 216 Neb. 206, 227, 344 N.W.2d 433, 447 (1984), wherein we held that aggravating circumstance (1)(d) was not present where a murder was achieved "swiftly and suddenly." Nor was it present in *State v. Stewart,* 197 Neb. 497, 250 N.W.2d 849 (1977), under similar, but even more gruesome, circumstances.

This view, moreover, is consistent with national precedent. In the case of *Godfrey v. Georgia,* 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), the U.S. Supreme Court reviewed the Georgia statute which required that before the penalty of death may be imposed the sentencing panel must find that the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code Ann. § 17-10-30(b)(7) (1982).

The facts of *Godfrey, supra* at 425, as disclosed by the opinion, were that the defendant

got out his shotgun and walked with it down the hill from his home to the trailer where his mother-in-law lived. Peering through a window, he observed his wife, his mother-in-law, and his 11-year-old daughter playing a card game. He pointed the shotgun at his wife through the window and pulled the trigger. The charge from the gun struck his wife in the forehead and killed her instantly. He proceeded into the trailer, striking and injuring his fleeing daughter with the barrel of the gun. He then fired the gun at his mother-in-law, striking her in the head and killing her instantly.

The jury imposed sentences of death and found beyond a reasonable doubt that " 'the offense of murder was outrageously or wantonly vile, horrible and inhuman,' " as required by statute. *Id.* at 426. In reversing the death penalty the U.S. Supreme Court said at 428-29:

[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." *Gregg v. Georgia, supra*, at 196, n. 47. . . .

. . . A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman."

In then concluding, however, that this ordinary sensibility was not sufficient to establish the aggravating circumstance required by the Georgia statute, the U.S. Supreme Court said at 446 U.S. at 433:

The petitioner's crimes cannot be said to have reflected a consciousness materially more "depraved" than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. Shortly after the killings, he acknowledged his responsibility and the heinous nature of his crimes. These factors certainly did not remove the criminality from the petitioner's acts. But, as was said in *Gardner v. Florida*, 430 U. S. 349, 358, it "is

of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."

Similarly, a number of state courts have passed upon the meaning of this aggravating circumstance. Their examination provides great assistance in applying it in the instant case. In *State v. Goodman*, 298 N.C. 1, 24-25, 257 S.E.2d 569, 585 (1979), the North Carolina court said:

G.S. 15A-2000(e)(9) states that the jury may consider as an aggravating circumstance justifying the imposition of the death penalty the fact that the "capital felony was especially heinous, atrocious, or cruel." While we recognize that every murder is, at least arguably, heinous, atrocious, and cruel, we do not believe that this subsection is intended to apply to every homicide. By using the word "especially" the legislature indicated that there must be evidence that the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection. *State v. Stewart, supra; State v. Rust, supra; State v. Simants*, 197 Neb. 549, 250 N.W. 2d 881, *cert. denied*, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed. 2d 158 (1977).

The Florida provision concerning this aggravating factor is identical to ours. Florida's Supreme Court has said that this provision is directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon*, 283 So. 2d 1 (Fla. 1973), *cert. denied*, 416 U.S. 943, 94 S.Ct. 1950 [sic], 40 L.Ed. 2d 295 (1974); *see also, State v. Alford*, 307 So. 2d 433 (Fla. 1975), *cert. denied*, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed. 2d 1221 (1976). Nebraska has also adopted the Florida construction of this subsection. Both Florida and Nebraska have limited the application of this subsection to acts done to the victim during the commission of the capital felony itself. *State v. Rust, supra; Riley v. State*, 366 So. 2d 19 (Fla. 1979). We too believe that this is an appropriate construction of the language of this provision. Under this construction, subsection (e)(9) will

not become a "catch all" provision which can always be employed in cases where there is no evidence of other aggravating circumstances.

And in *State v. Monroe*, 397 So. 2d 1258, 1274-75 (La. 1981), the Louisiana Supreme Court said:

> Although the jury found the instant offense to have been committed in an "especially heinous, atrocious or cruel manner," this finding cannot stand. It is true that the murder was brutal—the victim lost over two quarts of blood, her lungs were punctured and one of her ribs was severed. Her death was not instantaneous, and she lived long enough to call out for her daughter and reach for the telephone.
>
> Nonetheless, in order for a murder to be "especially heinous," there must exist *evidence* that there was "torture or the pitiless infliction of unnecessary pain on the victim." *State v. English*, 367 So.2d 815, 823 (La.1979). *State v. Clark*, 387 So.2d 1124 (La.1980), provides an example of what is meant by "especially heinous." In that case the defendant stabbed the victim thirty-five times before shooting him with a gun. In the instant case, the "wounds were inflicted to kill, not to maim or to inflict pain." *State v. Culberth*, supra, at 851. While there is some evidence in this case that the offense was heinous and cruel, it was not proved beyond a reasonable doubt that the instant offense was *especially* heinous.

(Emphasis supplied.)

In *Hopkinson v. State*, 632 P.2d 79 (Wyo. 1981), the defendant, tried under a statute identical to the Nebraska statute, argued that a jury could find any murder to be especially heinous, atrocious, or cruel and therefore could conclude that this aggravating circumstance is present in all cases. He contended that it, therefore, gave the jury a free rein to decide to sentence a person to death in every case and, thus, in effect, abolished the requirements previously established by the U.S. Supreme Court for imposing the death penalty. In rejecting that argument the Wyoming court said at 153-54:

> We disagree with appellant's conclusion. The statute

does *not* fail to properly channel the jury's sentencing decision and does *not* grant it unfettered discretion to impose the death penalty for arbitrary and capricious reasons. First, the statute requires the jury to find the murder to have been "especially heinous, atrocious or cruel." Webster's Third New International Dictionary defines heinous as "hatefully or shockingly evil." Thus the term "especially heinous" is more than just hatefully or shockingly evil. The murder, to be so classified, must demonstrate that the consciencelessness of the defendant is not only an outrage but also a dangerous and unrestrainable threat to society. Only when this is found can the murder properly be categorized as especially heinous. Since very few murders can be regarded in this manner, the term is *not* impermissible and vague.

The view of the Wyoming court is in accord with that of the U.S. Supreme Court. In *Proffitt v. Florida*, 428 U.S. 242, 255, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), *reh'g denied* 429 U.S. 875, 97 S. Ct. 198, 50 L. Ed. 2d 158, Justices Stewart, Powell, and Stevens, in the Court's plurality opinion, said:

In particular, the petitioner attacks the eighth and third statutory aggravating circumstances, which authorize the death penalty to be imposed if the crime is "especially heinous, atrocious, or cruel," or if "[t]he defendant knowingly created a great risk of death to many persons." §§ 921.141(5)(h), (c) (Supp. 1976-1977). These provisions must be considered as they have been construed by the Supreme Court of Florida.

That court has recognized that while it is arguable "that all killings are atrocious . . . [s]till, we believe that the Legislature intended something 'especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder." *Tedder v. State*, 322 So. 2d, at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim."

The necessary distinction to be made between what is simply heinous and what is especially heinous is pointed out by the

Alabama court in *Berard v. State*, 402 So. 2d 1044 (Ala. Crim. App. 1981), in which the trial court found that the homicides were "brutal" and therefore ordered the imposition of the death penalty. In discussing that matter the Alabama court said at 1050: "That the homicides were 'brutal' fails to conform to § 13-11-6(8) which requires a finding that the crime was '*especially* heinous, atrocious or cruel.' (Emphasis supplied.) The crime was in fact brutal, but the statute requires more."

Later, in the case of *McCray v. State*, 416 So. 2d 804 (Fla. 1982), the Florida Supreme Court again reviewed its statute, nearly identical to Nebraska's, and reversed a sentence of death because it found that the crime was not especially heinous, atrocious, or cruel, as previously defined by the Florida court. The facts of *McCray* indicated that a murder in which the victim died from three bullets to the stomach did not meet the statutory definition.

Similarly, in *Clark v. State*, 443 So. 2d 973, 977 (Fla. 1983), the Florida court again said:

> Directing a pistol shot to the head of the victim does not establish a homicide as especially heinous, atrocious, or cruel. *Kampff v. State*, 371 So.2d 1007 (Fla.1979). Although Mr. Satey testified that he heard his wife moan after being shot, there was no evidence of whether she was conscious after being shot, not [sic] did the medical examiner indicate how long Mrs. Satey survived or what degree of pain, if any, she suffered. Although the helpless anticipation of impending death may serve as the basis for this aggravating factor, there is no evidence to prove that Mrs. Satey knew for more than an instant before she was shot what was about to happen to her. Similarly, as pitiable as were Mr. Satey's vain efforts to dissuade his attackers from harming his wife, it is the effect upon the victim herself that must be considered in determining the existence of this aggravating factor.

The following year, Mississippi, in the case of *Billiot v. State*, 454 So. 2d 445 (Miss. 1984), considered the "especially heinous, atrocious or cruel" provision of its statute, saying at 464:

> [W]hat is intended by the words "especially heinous, atrocious or cruel", "are those capital crimes where the

actual commission of the felony was accompanied by such additional facts as to set the crime apart from the norm of capital felonies—*the consciencelessness* [sic] *or pitiless crime which is unnecessarily tortuous* [sic] *to the victim."*

During that same year Florida, in *Gorham v. State*, 454 So. 2d 556 (Fla. 1984), held that where one shot penetrated the victim's heart, causing death within 10 seconds, and where the evidence disproved any possibility of prolonged and torturous captivity and there was no evidence whatsoever that the victim apprehended certain death more than moments before he died, the aggravating circumstance in support of the death penalty that the murder was especially heinous, atrocious, and cruel, being based as it was upon the victim's having been thereafter shot twice in the back, could not be sustained.

In so holding, the Florida court said in *Gorham, supra* at 559: "While the murder was, of course, a cruel and unjustifiable deed, there is nothing about it to 'set the crime apart from the norm of capital felonies.' " The evidence indicated that the victim was already dead when the next two shots were fired. The Florida court's position was not based upon its notion that the murder was not terrible or even heinous but that, in order for the statute to be constitutional and not permit the imposition of the death penalty in every case, the aggravating circumstance "especially heinous" must be interpreted to be limited to those few cases in which the murder was committed in such a manner as to cause torture to the victim before death in a conscienceless and pitiless way. This distinction is made not because the courts are without sensitivity but, rather, because the death penalty may not be imposed unless clear, rigid standards are first met. See, *Thompson v. State*, 456 So. 2d 444 (Fla. 1984); *Rembert v. State*, 445 So. 2d 337 (Fla. 1984); *State v. Wilson*, 467 So. 2d 503 (La. 1985).

One may question why Supreme Courts are, in a sense, required to serve as "legal pathologists" who must, in a ghoulish fashion, dissect murders in order to separate the "especially heinous" from the merely "heinous," with nothing more than a word gauge which measures when a murder ceases being merely horrible and brutal and becomes "conscienceless,

pitiless, and unnecessarily torturous to the victim." That question must, however, more appropriately be directed to the legislatures which established the standards and not to the courts upon which the duty is imposed.

The lesson of all these cases is simply that before a court can find that the murder was "especially heinous," evidence must be adduced by the prosecution that more than a murder occurred. For a murder to satisfy the aggravating circumstance created by § 29-2523(1)(d), the evidence which is relevant for purposes of determining whether the murder was "especially heinous" must establish beyond a reasonable doubt that the victim, while alive, was tortured. What occurs to the body after death may often be even more reprehensible. Yet it does not, under the law, fall within the standards established by our Legislature for determining the presence of an "especially heinous" murder.

The evidence in this case is overwhelming that both young men were horribly tortured while still alive. Their murders were clearly conscienceless and pitiless, and Joubert is most deserving of a penalty of death within the meaning of the law.

Because of reasons more detailed by me in my concurrence and dissent in *State v. Palmer, ante* p. 282, 399 N.W.2d 706 (1986), I need not here discuss my view of the phrase "exceptional depravity" as used in § 29-2523(1)(d). Unlike the majority, I do not believe that there are two separate prongs, but simply one, and that in the instant case this murder was especially heinous, atrocious, and cruel. That it "manifested exceptional depravity" is merely a further factor in establishing that it was especially heinous, atrocious, and cruel. My point of disagreement with the majority is not the result reached by the majority, but the path taken in arriving at that conclusion.

Further, for reasons more fully set out in my concurrence and dissent in *State v. Palmer, supra*, I do not agree with the majority that only cases in which the death penalty has been imposed are to be used when conducting the proportionality review required by Neb. Rev. Stat. §§ 29-2521.01 to 29-2521.03 (Reissue 1985). I do, however, believe that the facts and circumstances in this case are so unique that there are no other cases with which a comparison can be made and that regardless

of which cases are used to conduct the review, one ultimately reaches the conclusion that the penalty of death in this case was properly imposed under the standards established by the Nebraska Legislature.