STATE OF NEBRASKA, APPELLEE, V. JAMES M. SAYLOR, APPELLANT.
392 N.W.2d 789

Filed August 29, 1986.   No. 85-724.

Patrick W. Healey and Susan Jacobs, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

The defendant, James M. Saylor, was convicted of second degree murder and sentenced to life imprisonment. He has appealed and has assigned as error the overruling of his motion to suppress statements made by him to Jeffrey Menard and David Timm.

The defendant's grandmother, Lena C. Saylor, was found dead in her home in Lincoln, Nebraska, on April 27, 1984. A neighbor had observed a white male in his late teens or early twenties running from Mrs. Saylor's home at about 5:30 a.m. that day. The police were called shortly thereafter. The parties stipulated that the pathologist who performed the autopsy on Lena Saylor's body would testify with a reasonable degree of medical certainty at trial that the cause of her death was respiratory arrest, and while Mrs. Saylor could have died of natural causes, the cause of the respiratory arrest was most probably smothering.

Following Lena Saylor's death, Jeffrey Menard and David Timm, friends and associates of the appellant, notified police authorities about conversations between the appellant and

themselves in which the defendant had indicated that he was thinking about killing his grandmother so that he could receive an expected inheritance.

On Saturday, April 28, 1984, Detective Sorensen of the Lincoln Police Department asked the defendant to come to the police station to be fingerprinted. The defendant arranged to meet Sorensen that afternoon and voluntarily went to the station at about 12:35 or 12:40 p.m. The defendant was then fingerprinted but not released. The defendant was taken to the chief of police's office, where he signed a *Miranda* warning and waiver form at 1:05 p.m. and was then questioned. Within a short period of time the detective's questions became accusatory. At that point, approximately 1:35 to 1:40 p.m., the defendant stated that he did not wish to be questioned further unless an attorney was present. The defendant was then placed in a holding cell but was not permitted to contact an attorney. He was kept in police custody at the station until 8 or 8:30 that evening.

During the time at the police station, the defendant estimated that he requested counsel on 15 to 20 occasions but was never given the opportunity to call a lawyer. He testified at the suppression hearing that each time he requested the assistance of counsel, Detective Sorensen would attempt to reengage him in discussions about Lena Saylor's death, despite the fact that he had not been given the opportunity to contact counsel. He also testified that Detective Peschong informed him that he was under arrest. There is no evidence that the defendant made any incriminating statements regarding his grandmother's death while in custody at the police station between 12:35 and 8:30 p.m.

Sometime after 8 that evening, two police detectives drove the appellant to his parents' home. During this trip, the defendant asked to be taken to his girlfriend's home. The detectives refused to do so. One of the detectives told the defendant that he would not be taken there because his driving privileges had been suspended and the detective did not want the defendant to drive the truck he had left at her home.

When the defendant arrived at his parents' house, he found Menard and Timm in the kitchen talking with his mother.

Following their conversations with the police concerning Saylor's prior statements about killing his grandmother, Menard and Timm had agreed to go to Saylor's home and attempt to engage him in conversation about Lena Saylor's death. Menard agreed to wear a microphone and transmitter capable of picking up any conversation between the three men. Although reluctant at first, Menard and Timm agreed to take the wire in and engage the defendant in conversation because the police had informed them that Saylor had accused them of somehow being involved in the death.

Before entering the home, Menard and Timm were instructed by the police on how to achieve the best transmission to a receiver located in a nearby patrol car. The police also suggested ways of initiating conversation about the death, such as telling the defendant they had been required to submit to a polygraph examination and that they had informed the police of the defendant's prior statements.

Sometime after the defendant's arrival at the house, it was suggested that the three men go for beer. Upon their return they went to the defendant's basement bedroom, where they drank beer, listened to music, and engaged in conversation. Menard and Timm stayed with the defendant for 1 to 2 hours, and during this time incriminating statements made by the defendant were transmitted to and recorded by the police. In one of the statements, the defendant indicated that he had hired someone to kill his grandmother. The defendant was arrested 10 to 15 minutes after Menard and Timm left the Saylor home. He was permitted to meet with an attorney for the first time the next morning.

The defendant was originally charged with first degree murder. On December 7, 1984, he filed a motion to suppress all statements made by him to Menard and Timm on April 28, 1984, and all recordings of any such statements. The motion alleged that the statements had been obtained in violation of the defendant's privilege against self-incrimination and his right to counsel as guaranteed by the 5th, 6th, and 14th amendments to the U.S. Constitution and by article I, §§ 3 and 12, of the Nebraska Constitution. The motion also alleged that the statements had been obtained in violation of the defendant's

right to privacy. The motion was denied on April 2, 1985.

The information was amended to charge second degree murder, when the defendant agreed to a bench trial. At the trial, tape recordings of the April 28 statements were received in evidence over objection.

The defendant contends that the trial court erred in (1) denying his motion to suppress, because the recordings of the conversations with Menard and Timm were obtained in violation of his right against compelled self-incrimination and his right to effective assistance of counsel, and in (2) receiving the recordings in evidence over objection and in rendering judgment and sentence based thereon.

With regard to the contention that the recorded statements were obtained in violation of Saylor's 5th and 14th amendment rights against compelled self-incrimination, the 5th amendment in pertinent part provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."

Certain procedural safeguards were then set out by the *Miranda* Court, including the now familiar *Miranda* warnings. Included as a safeguard was the rule that if a defendant indicates during the course of custodial interrogation the desire to consult with an attorney before answering any questions, interrogation must cease until an attorney is present. This view was reaffirmed in *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981): "[A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." See, also, *State v. Joy*, 218 Neb. 310, 353 N.W.2d 23 (1984). If Saylor had made

incriminating statements after invoking his right to counsel, while in custody at the police station, it appears that the statements would have been inadmissible.

The *Miranda* requirements and safeguards, however, do not apply outside the context of the inherently coercive *custodial* interrogations for which they were designed. *Minnesota v. Murphy*, 465 U.S. 420, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984).

According to the *Miranda* Court, custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra* at 444. Later, in *Oregon v. Mathiason*, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), the Court emphasized that custody for *Miranda* purposes requires restriction of one's freedom of movement, because that is the type of coercive environment to which the *Miranda* safeguards were directed. See, also, *State v. Parsons*, 213 Neb. 349, 328 N.W.2d 795 (1983).

More recently, the Court has determined that the ultimate inquiry regarding the custodial status of a suspect "is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983). See, also, *Minnesota v. Murphy, supra.*

In the present case the trial court determined that the statements in question were neither compelled nor made while Saylor was in custody. At the outset we note that in reviewing the trial court's factual determinations on a motion to suppress, we will not overturn those findings unless they are clearly wrong. *State v. LaChappell*, 222 Neb. 112, 382 N.W.2d 343 (1986).

Although Menard and Timm were police agents who deliberately elicited incriminating responses from the defendant, the trial court was not clearly wrong in finding that the statements were noncustodial.

The defendant contends that the circumstances surrounding his conversation with Menard and Timm transformed the setting into a custodial one. In support of this notion, he points to evidence that the detectives refused to drive him anywhere but home, that the detectives did not leave, after dropping him

off, until sometime after he could no longer see them, that he was flanked by two police agents at all times, and that there was heavy police surveillance in the area. The defendant was unaware that Menard and Timm were acting as police agents. The defendant testified at the suppression hearing that while he thought he might "possibly" be under surveillance when he was dropped off at home, he did not consider himself under arrest at the time of the discussion with Menard and Timm. While he testified that he did not know if he was free to come and go as he pleased during that time, he conceded that he was able to leave the house with Menard and Timm to get beer, without police interference.

Recently, in *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984), Justice Marshall wrote: "A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."

Aside from the fact that the detectives would not take the defendant to his girlfriend's house nor drop him off at a street corner near his home, there is no evidence that he was not free to leave or that his freedom of movement was restricted to a degree associated with arrest, after he had been released at home. In fact, the defendant did not think that he was under arrest. While he testified that he was not sure if he was then free to come and go, the record shows that he, Menard, and Timm freely left the house to obtain beer. He also testified that his statements to Menard and Timm were freely and voluntarily made. He did not ask Menard and Timm to leave nor make any effort to avoid engaging in conversation with them. The evidence clearly shows that Saylor was not in custody when the incriminating statements were made.

The circumstances in this case are not analogous to those in *Orozco v. Texas*, 394 U.S. 324, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969). In that case the U.S. Supreme Court held that the defendant's fifth amendment rights had been violated because he had been interrogated in his bedroom at 4 o'clock in the morning by four police officers, without the benefit of *Miranda* warnings. One of the officers in *Orozco* testified that the

defendant was under arrest and not free to leave while being questioned.

Because we find that the trial court's determination that Saylor's statements were made in a noncustodial setting was not clearly wrong, we conclude that the appellant's fifth amendment rights, as delineated in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), were not violated by the police in this case. Instead, this case is more analogous to the situation presented in *Hoffa v. United States*, 385 U.S. 293, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966), where the U.S. Supreme Court refused to suppress, on fifth amendment grounds, incriminating statements to an undercover agent. The defendant attempts to distinguish *Hoffa* on the basis that the defendant there had not yet invoked his right to counsel. This argument ignores the fact that Saylor's statements were not made in custody where the *Miranda* and *Edwards* safeguards were intended to apply.

With regard to whether the defendant's sixth amendment rights were violated, once the sixth amendment right to counsel has attached, the State must honor that right and may not secretly and deliberately interrogate the defendant in the absence of counsel. See, *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985); *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980); *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

Relying on *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964), the defendant argues that his sixth amendment right to counsel had attached prior to his conversation with Menard and Timm because, given the adversarial and accusatory nature of the interrogation at the police station, for all practical purposes he had been charged. The fact is he had not been formally charged at that point.

In *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972), the U.S. Supreme Court stated that "it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against

him." The Court also recognized that, except for *Escobedo*, all of its cases had indicated that the right attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby, supra* at 689. *Escobedo* was said to be inapposite as to this issue because its primary purpose was not to vindicate the right to counsel as such but to guarantee the fifth amendment right against self-incrimination. It was also noted in *Kirby* that the holding of *Escobedo* has been limited to its own facts, in *Johnson v. New Jersey*, 384 U.S. 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882 (1966).

Recently, in *Moran v. Burbine*, 475 U.S. ____, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), the U.S. Supreme Court addressed the issue of when the sixth amendment right to counsel attaches regarding a suspect who was in custody, received the *Miranda* warnings, signed three valid waivers, and made incriminating statements. The facts in *Moran* indicate that the respondent's sister had contacted an attorney for him after he was in custody. The attorney, upon speaking with the detention authorities and informing them that she would act as respondent's counsel, was told that the respondent would not be interrogated any further that evening. In fact, the respondent was interrogated within an hour following the attorney's call. The respondent was never informed of the attorney's call, nor did he request an attorney after waiving that right.

On appeal Burbine's counsel, relying on *Escobedo*, argued inter alia that the sixth amendment required exclusion of his confessions. The Court recognized the difficulty with this argument, in that the interrogation sessions took place before Burbine had been charged.

In resolving this issue the Court, citing to *Kirby*, stated that "subsequent decisions foreclose any reliance on *Escobedo* and *Miranda* for the proposition that the Sixth Amendment right, in any of its manifestations, applies prior to the initiation of adversary judicial proceedings." *Moran, supra* at 1145.

The Court ultimately concluded that "the Sixth Amendment right to counsel does not attach until after the initiation of formal charges." *Moran, supra* at 1146. In support of this conclusion the Court stated that the purpose of the sixth

amendment is to assure in any criminal prosecution that "the accused shall not be left to his own devices in facing the ' " 'prosecutorial forces of organized society.' " ' " *Moran, supra* at 1146. The Court also cited *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985), as support. In *Moulton* the Court concluded that evidence obtained surreptitiously as to two crimes must be suppressed regarding the crime for which the defendant had been indicted, at the time of his statements, but not as to the crime for which there was no indictment. In the *Moran* Court's view, its holding that the sixth amendment did not attach until formal charges were initiated was clearly implied by the *Moulton* result.

In the present case the defendant's sixth amendment argument fails because he had not been formally charged at the time he made his inculpatory statements. "[T]he initiation of adversary judicial proceedings, far from being mere formalism, is fundamental to the proper application of the Sixth Amendment right to counsel." *Moran, supra* at 1146.

Nebraska's constitutional counterparts to the fifth and sixth amendments do not require a different result. Neb. Const. art. I, §§ 3, 11, and 12.

There being no error in the ruling on the motion to suppress, the defendant's statements to Menard and Timm were admissible and were properly considered by the trial court in rendering its judgment.

The judgment is affirmed.

AFFIRMED.