STATE OF NEBRASKA, APPELLEE, V. CLARENCE VICTOR, APPELLANT.
457 N.W.2d 431

Filed July 13, 1990.    No. 88-982.

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley for appellant.

Robert M. Spire, Attorney General, and Sharon M. Lindgren for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.
Clarence Victor appeals the imposition of the death penalty by a three-judge panel following his district court for Douglas County jury convictions for first degree murder and use of a weapon to commit a felony. We affirm.

On appeal, Victor does not challenge the overwhelming evidence that sustains his convictions but, rather, contends: (1) Statements made by the defendant to Omaha police officers should have been suppressed and ruled inadmissible at his trial; (2) Neb. Rev. Stat. § 29-2523(1)(d) (Reissue 1989) is unconstitutionally vague and allows for arbitrary application in a capital sentencing proceeding; (3) the sentencing panel improperly received into evidence his 1964 manslaughter confession in support of its finding that § 29-2523(1)(a) was proven beyond a reasonable doubt; (4) there was insufficient evidence to support a finding that § 29-2523(1)(d) was proven beyond a reasonable doubt; (5) the sentencing panel erroneously found that mitigating circumstance § 29-2523(2)(g) was not proven; and (6) the sentencing panel erred in finding the sentence of death was not disproportionate or excessive.

In reviewing a criminal conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, whose findings must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support them. *State v. Wright, ante* p. 564, 456 N.W.2d 288 (1990); *State v. Jones, ante* p. 1, 453 N.W.2d 447 (1990).

Taking the view most favorable to the State, the facts reflect that at approximately 6 p.m. on December 26, 1987, Omaha police were dispatched to 2125 Ohio Street in Omaha, Nebraska. Upon arrival, the officers entered the residence and observed the deceased, 82-year-old Alice Singleton, lying on the floor in the kitchen area. Among other injuries, the deceased had a laceration to the neck area which was determined to be the cause of her death.

Investigation revealed that Clarence Victor, who had been convicted of two previous homicides, had performed gardening work for the deceased. A neighborhood canvass revealed that a neighbor had seen an older model cream-colored vehicle parked west of the deceased's home at 5 p.m. on the day of the murder. A male, described as between the ages of 30 and 40, wearing sunglasses and a hat, was seated in the car. The same neighbor later told police that Victor's vehicle was similar to the one she

had seen, but she could not positively identify it as the same vehicle.

The defendant's auto, which was near his home, was placed under surveillance. Once Victor was in his vehicle, officers were instructed to stop Victor's vehicle and make contact with the driver. After a period of time, a male entered the vehicle and proceeded north on 25th Avenue in Omaha. The vehicle turned into Church's Fried Chicken on 30th Street. A police cruiser pulled in directly behind the vehicle, and soon thereafter, an unmarked police vehicle also arrived. Upon request by an officer, the operator produced his driver's license. The driver, after being identified as Clarence Victor, was informed by police that an investigation was being conducted. The police asked Victor if he would voluntarily accompany them to the police station. Although Victor was not informed of the nature of the investigation, he nevertheless was cooperative and readily agreed to the request of the police officer. He was then transported to the police station in an unmarked police vehicle.

Once at the station, the defendant was questioned about his whereabouts on December 26, 1987. He was not advised of his rights as established in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), or told that he was under arrest. The defendant informed police that he had not been near the deceased's residence on the day of the murder.

Victor gave a written consent for law enforcement officers to search his residence and his automobile. He also agreed to provide hair samples and fingernail clippings and scrapings. While at Victor's residence, a police officer interviewed the defendant's brother-in-law concerning the defendant's whereabouts on December 26, 1987. The brother-in-law's statements were inconsistent with those previously given by the defendant. The police informed Victor that they had discovered some inconsistencies and asked the defendant if he would return to the police station for more questioning. Without requesting any additional information regarding the alleged inconsistencies, the defendant agreed to accompany the police and undergo further questioning.

After returning to the station, Victor was left alone while the officers consulted with a sergeant concerning the investigation.

Upon the officers' return, Victor was advised of his *Miranda* rights and acknowledged that he understood he was talking with police officers, waived his right to remain silent, acknowledged that anything he said could be used against him in court, and acknowledged his right to consult with a lawyer and have one present during questioning as well as his right to have a lawyer appointed to represent him if he could not afford one. Victor waived his *Miranda* rights and agreed to make a statement to the police.

Once again, the police proceeded to question the defendant with regard to his whereabouts on the day of the murder. Victor gave a different version of his whereabouts on the day of the murder, but this amended version was still inconsistent with the version given by the defendant's brother-in-law. After further questioning, Victor admitted to being at the victim's residence on the day of the murder. However, he denied involvement in Singleton's murder.

Victor's attention was directed to a previous homicide of which he had been convicted in 1964. Officer Pitmon Foxall of the Omaha Police Division testified:

> I specifically told Mr. Victor that when my father had investigated that homicide that he didn't lie to my father, and that he didn't have to lie to me. And that's when Mr. Victor told me at that point that he had been at the Singleton residence. He said that he had knocked on the door, she answered, there had been some argument by Mrs. Singleton, at which time he struck her.

The evidence from the suppression hearing reflects that after Victor made a verbal confession to the officers, the defendant jumped up and, without making a lurch or run toward a window, said, "I'm going to jump out of the window." The police officers calmed Victor.

Victor agreed to give a tape-recorded statement concerning his involvement in Singleton's death. This statement was received into evidence over the defendant's objection. In his taped statement, Victor acknowledged that he went to Singleton's home on December 26, 1987, and knocked on the door. After opening the door, Singleton began to scream and swing her hand and scratched him. A photograph of Victor's

face which was received at trial reflects scratches where the defendant said Singleton scratched him. Victor said he struck the victim with his hand and knocked her down and then struck her in the head three times with a pipe which he said he carried in his car for protection. He claimed that Singleton got tangled in some type of blue cord and that he used his pocketknife to cut the cord loose from her throat. Victor indicated that he then left Singleton's residence and, on his way home, threw away his pocketknife, the blue cord, and the pipe.

The evidence before the jury reflects that during his taped confession, Victor was relatively calm. After the taped confession, the defendant was told by the officers that he would be booked for murder in the first degree and for use of a weapon in the commission of a felony. Thereupon, Victor jumped toward the window in the interview room. It was necessary for the officers to quiet the defendant to prevent him from jumping through the window.

Dr. Blaine Roffman, a pathologist who performed an autopsy on Singleton, testified at Victor's trial that he saw contusions above the right eyebrow and on the right cheek area and some discoloration around Singleton's right orbital area. He also observed swelling around the left eye and a bruise to the left ear. The multitude of bruises on Singleton were caused by multiple blows, according to the pathologist. Dr. Roffman said that there were five lacerations to Singleton's neck and throat area, three of which penetrated deeply. They were caused by a sharp instrument. One penetrated to the depth of the victim's thyroid cartilage, or Adam's apple, about 3 inches. Dr. Roffman also noted that one of the lacerations was characterized by an irregular border. He stated that such an irregular border usually meant that there was not one quick stroke with a weapon, but some hesitation or "stopping and going" as the laceration was made.

Singleton also sustained fractures of the fourth through ninth ribs on the right side of her body and the second through ninth ribs on the left side of her body. There was hemorrhaging surrounding the fracture sites.

Dr. Roffman testified there was marked subscalp edema and hemorrhage throughout the entire front and lateral parts of

Singleton's scalp. The victim's brain showed subarachnoid hemorrhage above the left temporal lobe and left parietal area. There was subarachnoid hemorrhage of the right lateral occipital lobe and over the right parietal area of the brain. Dr. Roffman concluded that these injuries were caused by blunt trauma. He said that the trauma was caused by several blows to the head.

Singleton's death was attributed to a laceration of a branch of the left carotid artery with subsequent hemorrhaging. Dr. Roffman testified that it took 3 to 5 minutes for Singleton to bleed to death.

After the State rested its case, the defendant rested without adducing any evidence.

Following Victor's jury convictions, a three-judge panel was convened to determine the sentence to be imposed on the defendant for murder in the first degree. The sentencing panel received into evidence a certified copy of the judgment and sentence in *State v. Clarence Victor*, docket 95, No. 308, in the district court for Douglas County, Nebraska, showing the defendant's conviction in 1976 for murder in the second degree. Also received in evidence was a certified copy of the record in *State v. Clarence Victor*, docket 70, No. 304, in the district court for Douglas County, Nebraska, evidencing the defendant's 1964 manslaughter conviction and Victor's confession of that crime to police. In addition, police reports of the manslaughter were received in evidence, as were records of the state Department of Correctional Services relating to the defendant while he was incarcerated in the Nebraska Penal and Correctional Complex on previous occasions.

Victor objected to the reception into evidence of his manslaughter confession, contending it was not given in conformity with the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant also filed a motion in limine asking the trial court to preclude the State from introducing evidence in support of § 29-2523(1)(d). Victor argued that aggravating circumstance (1)(d) was unconstitutionally vague and violated the eighth amendment to the U.S. Constitution and article I, § 9, of the Nebraska Constitution, as the application of the statute led to

arbitrary results. Contending the Nebraska death penalty statute constituted cruel and unusual punishment, defendant also moved the trial court to declare a portion of Neb. Rev. Stat. § 28-105 (Reissue 1985) null and void.

The panel overruled defendant's objections, rejected his challenges to the constitutionality of the Nebraska death penalty statutes, and sentenced him to death.

In support of its finding, the panel determined that the State had proven beyond a reasonable doubt that Victor "was previously convicted of another murder or a crime involving the use or the threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity," which constitutes an aggravating circumstance under § 29-2523(1)(a). To support the existence of aggravating circumstance (1)(a) the panel relied on Victor's convictions for second degree murder and manslaughter and the police reports in the 1964 manslaughter conviction.

The panel also found that § 29-2523(1)(d) was proven beyond a reasonable doubt. Section 29-2523(1)(d) reads: "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." In making its finding that aggravating circumstance § 29-2523(1)(d) existed, the panel separated the section into two prongs. It specifically found that prong one, i.e., the murder "was especially heinous, atrocious, cruel," was proven beyond a reasonable doubt.

The panel stated:

The panel finds from the evidence beyond a reasonable doubt that the murder of Alice Singleton was especially heinous, atrocious and cruel in that she was subjected to the imposition of extreme suffering by the defendant prior to her death, all as demonstrated by the nature of the injuries described above, the manner of their infliction, and her being alive and conscious during most if not all of the assault. Therefore, the panel finds that this prong of this aggravating circumstance exists beyond a reasonable doubt.

As to the second prong of § 29-2523(1)(d), "manifested exceptional depravity by ordinary standards of morality and

intelligence," the panel found there was insufficient evidence to prove its existence beyond a reasonable doubt.

The panel concluded that none of the statutory mitigating circumstances as set out in § 29-2523(2)(a) to (2)(g) were present, but found that the defendant's prison record compiled during his incarcerations for prior convictions was a mitigating circumstance. The panel found that the sentence of death was not excessive or disproportionate to the penalty imposed in similar cases.

## I. MOTION TO SUPPRESS

Victor first contends the trial court committed reversible error in failing to suppress statements he made to Omaha police concerning his actions at the home of the victim. The defendant asserts those statements were the fruit of an unreasonable seizure of his person and were obtained in violation of his right against self-incrimination.

In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Juhl*, 234 Neb. 33, 449 N.W.2d 202 (1989). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress. *Id.*

Prior to trial, Victor filed a motion to suppress requesting that the State be prohibited from using any statements he made to the police, contending those statements were obtained in violation of defendant's rights under the fourth and fifth amendments to the U.S. Constitution. Victor alleged that he was not properly advised of his constitutional rights as dictated in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); that he did not make a voluntary or intelligent waiver of his rights; that his interrogation was commenced prior to his being advised of his rights to remain silent and to assistance of counsel; and that the statements were the product of coercion, deception, and inducements of leniency. Victor claimed his statements were the fruit of an unlawful arrest.

Following a hearing, the trial court overruled defendant's suppression motion, finding:

1. That all statements made by the defendant prior to being advised of his Miranda rights were made at a time when defendant was neither in custody of or otherwise deprived of his freedom by members of the Omaha Police Division in any significant way.

2. That the defendant [later] made a voluntary and intelligent waiver of his constitutional rights as required by Miranda.

3. That all statements made by the defendant were made voluntarily, knowingly, understandingly and intelligently.

4. That all statements made by the defendant after being advised of his Miranda rights were made pursuant to a lawful arrest by members of the Omaha Police Division.

*Miranda v. Arizona, supra,* prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. The State concedes that such safeguards were not employed in the early stages of the police interviews. Thus, the pertinent question is whether the interviewing of Victor prior to his being advised of his *Miranda* rights constituted "custodial interrogation." If not, the ruling of the trial court is correct; but if the interviews did constitute custodial interrogation, the ruling of the trial court is erroneous, and the statements should have been suppressed.

Obviously, the interrogations were "custodial" only if Victor was in custody at the time of questioning. One is in custody for *Miranda* purposes when there is a formal arrest or a restraint on his or her freedom of movement of the degree associated with such an arrest. *Berkemer v. McCarty*, 468 U.S. 420, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); *State v. Saylor*, 223 Neb. 694, 392 N.W.2d 789 (1986). "Determinations as to whether a person has been seized, in the constitutional sense, are questions of fact." *State v. Bowersmith*, 224 Neb. 6, 9, 395 N.W.2d 527, 529 (1986). See, also, *State v. LaChappell*, 222 Neb. 112, 382 N.W.2d 343 (1986).

The question of whether a person's consent to accompany law enforcement officials was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of the circumstances and is a matter that the State has the burden of proving. *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980).

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for the purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

*California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983).

In *Beheler*, the defendant voluntarily went to the police station. While at the station, he talked about a murder but was not advised of his *Miranda* rights. The California Supreme Court found that this was a custodial interrogation and suppressed the statements. In reversing the California Supreme Court, the U.S. Supreme Court held that an inculpatory statement made by a suspect who was not given the *Miranda* warnings but who voluntarily went to the police station, was not placed under arrest, and was allowed to leave unhindered after an interview of less than 30 minutes was admissible, as the conditions of the suspect's voluntary participation did not render him "in custody." In *State v. Parsons*, 213 Neb. 349, 328 N.W.2d 795 (1983), this court held that a suspect who was interrogated in a police station but who was free to leave was not in custody.

Victor contends that "the police had formulated a plan designed to subtly overcome the Defendant's will by a show of strength, as illustrated by three police vehicles present at the point where the Defendant was initially contacted in his automobile." Brief for appellant at 13. Defendant further alleges that he "was not allowed to drive his own vehicle down to the police station, but rather was taken in a police car, thereby giving the police officers total control over the Defendant's movements and further over the venue of the

questioning of the Defendant." *Id.* Victor argues these actions by the police undermine any claim of the State with regard to the voluntariness of defendant's actions in accompanying the police for questioning.

In the initial contact with Victor, a police officer merely asked the defendant to voluntarily accompany him to Central Police Station for questioning. Victor asked if he could leave his car where it was parked. The defendant was very cooperative, readily agreed to accompany the police, and was transported in an unmarked police car. Victor was not handcuffed. When asked if he would consent to searches of his house and his vehicle, Victor readily agreed. He also was very agreeable and cooperative when asked if he would consent to the police's taking fingernail clippings and scrapings as well as hair samples from him. Defendant also agreed to accompany police to his home for a consensual search. Thereafter, Victor readily agreed to return to the police station for more questioning concerning various inconsistencies the police had uncovered. After returning to the police station, Victor was left alone in a room while the police officers consulted with a sergeant about the investigation. Upon returning from talking with the sergeant, the police obviously considered that Victor's freedom was restricted as of that time because, as previously indicated, the officers informed the defendant of his *Miranda* rights. Victor waived his *Miranda* rights and agreed to make a statement to the police.

The record clearly demonstrates that Victor voluntarily cooperated with the police. There is no evidence that the police prevented Victor from exercising any of his *Miranda* rights at any time or prevented him from terminating any searches he had authorized.

Given the totality of the circumstances, it cannot be said the trial court was clearly wrong in concluding that prior to being advised of his *Miranda* rights, Victor was not in custody or deprived of his freedom.

The defendant's assertion that a request to go to a police station for questioning carries an implication of obligation so awesome for a suspect that it renders his actions involuntary is not persuasive. As the U.S. Supreme Court noted in *Oregon v.*

*Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977),

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody."

All of the trial court's findings we have discussed which have been questioned by the defendant are not clearly wrong and, indeed, are fully supported by the evidence.

## II. CAPITAL PUNISHMENT

Victor's five remaining assignments of error address the sentence of death imposed on him by the sentencing panel. Defendant's first assignment of error in this regard challenges the constitutionality of § 29-2523(1)(d). Victor's next three assignments of error question the existence of aggravating circumstances and nonexistence of mitigating circumstances as found by the sentencing panel. The defendant's final assignment of error questions what he alleges to be the excessiveness of his sentence in relation to other death penalty cases.

When a defendant is found guilty of murder in the first degree by trial, the sentence may be imposed by the judge who presided at the trial or by a panel of three judges including the judge who presided at the trial. The two additional judges are designated by the Chief Justice of the Nebraska Supreme Court. See Neb. Rev. Stat. § 29-2520 (Reissue 1989). In Victor's case, the sentencing panel consisted of three judges, including the judge who presided at the defendant's trial.

Neb. Rev. Stat. § 29-2522 (Reissue 1989) requires a sentencing court, as prescribed in § 29-2520, to proceed in part

as follows:

>After hearing all of the evidence and arguments in the sentencing proceeding, the judge or judges shall fix the sentence at either death or life imprisonment, but such determination shall be based upon the following considerations:
>
>(1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death;
>
>(2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or
>
>(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Neb. Rev. Stat. § 29-2525 (Reissue 1989) requires the Supreme Court to review all cases in which the death penalty has been imposed. See, also, *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

What are aggravating and mitigating circumstances is, to a large extent, prescribed by statute, although the courts are required to consider any relevant evidence in mitigation. See, *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986); *State v. Palmer, supra*. There is no burden of proof with regard to mitigating circumstances. The State may present evidence that is probative of the nonexistence of a mitigating circumstance, while the defendant may present evidence that is probative of the existence of a statutory or nonstatutory mitigating circumstance. However, because Neb. Rev. Stat. §§ 29-2521 et seq. (Reissue 1989) do not require the State to disprove the existence of mitigating circumstances, the risk of nonproduction and nonpersuasion is on the defendant. *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990).

Section 29-2523 exclusively lists the factors that may be relied upon in imposing the death penalty. *State v. Reeves, supra*. Aggravating circumstances must be proven beyond a reasonable doubt. *State v. Joubert, supra*. Section 29-2523(1) defines aggravating circumstances as follows:

>(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to

the person, or has a substantial history of serious assaultive or terrorizing criminal activity;

(b) The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime;

(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;

(e) At the time the murder was committed, the offender also committed another murder;

(f) The offender knowingly created a risk of death to at least several persons;

(g) The victim was a law enforcement officer or a public servant having custody of the offender or another; or

(h) The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws.

The mitigating circumstances defined by § 29-2523(2) are as follows:

(a) The offender has no significant history of prior criminal activity;

(b) The offender acted under unusual pressures or influences or under the domination of another person;

(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;

(d) The age of the defendant at the time of the crime;

(e) The offender was an accomplice in the crime committed by another person and his participation was relatively minor;

(f) The victim was a participant in the defendant's conduct or consented to the act; or

(g) At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or

intoxication.

In addition, a defendant may offer any relevant evidence on the issue of mitigation. See *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989).

In *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the U.S. Supreme Court held that the death penalty may only be imposed under sentencing procedures that do not create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. "[A state] must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). In *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), the U.S. Supreme Court held that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

Section 29-2523 provides guidelines that must be followed in order to avoid the indiscriminate application of the death penalty. "Absent such guidelines, the imposition of the death penalty in a particular case must be set aside as being in violation of the U.S. Constitution as declared by the U.S. Supreme Court." *State v. Joubert*, 224 Neb. 411, 425, 399 N.W.2d 237, 248 (1986).

### A. Constitutionality of § 29-2523(1)(d)

Defendant first contends that aggravating circumstance (1)(d) of § 29-2523 is unconstitutionally vague and allows for arbitrary application in a capital sentencing proceeding.

Section 29-2523(1)(d) provides: "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." Because the sentencing panel concluded that only the first prong of (1)(d), "especially heinous, atrocious, cruel," was proven beyond a reasonable doubt and because we are mindful of the U.S. Court of Appeals for the Eighth Circuit ruling in *Moore v.*

*Clarke*, No. 88-2584 (8th Cir. May 25, 1990), our discussion is limited to the constitutionality of the first prong of § 29-2523(1)(d).

The U.S. Supreme Court, in *Maynard v. Cartwright*, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988), affirmed the U.S. Court of Appeals for the Tenth Circuit holding that "heinous," "atrocious," and "cruel," as used in an Oklahoma murder sentencing statute were "unconstitutionally vague" under the eighth amendment to the U.S. Constitution. In that ruling, the Court noted that the Oklahoma courts had not adopted a limiting construction that cured the infirmity in the Oklahoma statute. But cf. *Lindsey v. Thigpen*, 875 F.2d 1509 (11th Cir. 1989) (the "heinous, atrocious or cruel" aggravating factor in Alabama's death penalty statute had been narrowed to those homicides that were unnecessarily torturous to the victim for purposes of determining whether imposition of the death penalty was unconstitutionally "wanton" or "freakish").

Unlike the Oklahoma court in *Maynard v. Cartwright*, this court has adopted limiting language to guide Nebraska courts in applying the first prong of § 29-2523(1)(d) so as to remedy any constitutional infirmity of vagueness.

In *State v. Rust*, 197 Neb. 528, 538-39, 250 N.W.2d 867, 874 (1977), we adopted the following statement made by the sentencing panel:

> "We recognize that all first degree murder crimes are capable of being accurately characterized by one or more of the descriptive adjectives employed [in § 29-2523(1)(d)], but by the use of the [word] 'especially' . . . the legislature has required a much greater degree of these characteristics than is usually present in a murder. This category of aggravating circumstances would include murders involving torture, sadism, sexual abuse . . . ."

In discussing the first prong of (1)(d) in *State v. Moore*, 210 Neb. 457, 470, 316 N.W.2d 33, 41 (1982), we held:

> Aggravating circumstance (1)(d) of § 29-2523 literally, and as interpreted by this court, describes in the disjunctive two separate circumstances which may operate in conjunction with or independent of one another. The first circumstance is that the murder was especially

heinous, atrocious, or cruel. We have said that this circumstance is directed to the "pitiless crime which is unnecessarily torturous to the victim" and to cases where torture, sadism, or the imposition of extreme suffering exists.

In *State v. Ryan*, 233 Neb. 74, 142, 444 N.W.2d 610, 652 (1989), after restating our holdings in *Rust* and *Moore*, we concluded:

> Thus it can be seen that this court has adopted a limiting construction on aggravating circumstance (1)(d), as shown in cases extending from 1977 to 1986. We have held that "especially heinous, atrocious, or cruel" is limited to cases where "torture, sadism, or the imposition of extreme suffering exists," *State v. Moore, supra* at 470, 316 N.W.2d at 41, or where the murder was preceded by acts "performed for the satisfaction of inflicting either mental or physical pain or that pain existed for any prolonged period of time," *State v. Hunt*, [220 Neb. 707, 725, 371 N.W.2d 708, 721 (1985)].

Victor correctly points out that the sentencing panel misquoted *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977), in that portion of its findings relating to the constitutionality of the first prong of aggravating circumstance (1)(d). It is clear, however, that the sentencing panel correctly applied the constitutionally valid guidelines we have established for determining whether a murder was especially heinous, atrocious, or cruel in its determination that § 29-2523(1)(d) existed beyond a reasonable doubt. As the aggravating circumstance was not invalidly applied, the error committed by the panel in misquoting *Peery* is harmless beyond a reasonable doubt.

We conclude, as we did in *State v. Ryan, supra*, and *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), that this court has adopted such a narrow construction of § 29-2523(1)(d) as to render the first prong of the Nebraska statute sound and in full compliance with the U.S. Constitution. See, also, *Harper v. Grammer*, 895 F.2d 473 (8th Cir. 1990); *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990). Such a narrow construction does not lead to arbitrary results. Victor's assignment of error

that the first prong of § 29-2523(1)(d) is unconstitutional is meritless.

## B. Findings of the Sentencing Panel

Assignments of error Nos. 3 through 5 address findings and rulings of the sentencing panel with regard to the existence or nonexistence of aggravating and mitigating circumstances.

The sentencing panel found that aggravating circumstances (1)(a) and (1)(d) exist beyond a reasonable doubt and that no mitigating circumstances as defined in § 29-2523(2) exist. The panel did find that defendant's prison record compiled during previous incarcerations was a mitigating circumstance.

### 1. Aggravating Circumstance (1)(a)

Victor first contends the sentencing panel improperly received into evidence his 1964 manslaughter confession in support of its finding that § 29-2523(1)(a) was proven beyond a reasonable doubt. Defendant objected to the admission of the confession, arguing that it did not conform to the requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Aggravating circumstance (1)(a) sets forth three separate factual situations upon which a sentencing panel may conclude that (1)(a) exists. It states: "The offender was previously convicted of another murder *or* a crime involving the use or threat of violence to the person, *or* has a substantial history of serious assaultive or terrorizing criminal activity." (Emphasis supplied.)

The sentencing panel concluded that Victor had been previously convicted of second degree murder in 1976. The evidence supporting this conclusion is uncontroverted. We conclude, as a matter of law, that defendant's previous second degree murder conviction is, in itself, sufficient to support a finding that (1)(a) exists beyond a reasonable doubt. Thus, we need not decide whether the sentencing panel erred in receiving the confession into evidence, as any error committed in receiving the manslaughter confession would be harmless beyond a reasonable doubt.

## 2. Aggravating Circumstance (1)(d)

Victor next argues that even if § 29-2523(1)(d) is constitutional, there was insufficient evidence to support a finding that (1)(d) existed beyond a reasonable doubt. Section 29-2523(1)(d) reads: "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." The panel correctly separated this section into two prongs. It concluded that the second prong, "manifested exceptional depravity by ordinary standards of morality and intelligence," was not proven beyond a reasonable doubt, but it specifically found that prong one, that is, "[t]he murder was especially heinous, atrocious, cruel," was proven beyond a reasonable doubt. After acknowledging that this court has established sufficient standards and guidance so as to make this prong of this aggravating circumstance constitutionally firm, the panel set forth the following:

The evidence shows that in the late afternoon of December 26, 1987, the defendant went to the victim's home. The victim was an elderly woman, 82 years of age, four feet eleven inches in height, and weighing approximately 130 [sic] pounds. The defendant was a man 55 years of age, five feet eight inches tall and approximately 160 pounds. The defendant had previously done yard work for the victim.

After the defendant entered the victim's home, a struggle ensued during which the defendant struck the victim about the face and head with his fists, then beat her with a pipe, and then cut her throat, the latter resulting in her bleeding to death.

The autopsy revealed that as a result of defendant's assault, the victim sustained numerous injuries to the face and head including four areas of brain hemorrhage, six broken ribs on the right side of her body, and eight broken ribs on the left side, all with hemorrhage. The victim sustained a minor laceration in her pubic area and five lacerations to her throat, two of which were vertical and superficial, and three of which were lateral and penetrating. Two of the penetrating wounds were ragged

and described by the pathologist as "stop and go" cuts rather than a quick even slash, one of these latter wounds penetrating to the area of the Adam's apple and cutting a branch of the carotid artery which resulted in the victim's bleeding to death. The medical evidence reveals that in addition to the cuts above described, the injuries to the head and body of the victim were the result of blunt trauma, evidencing a number of blows, and that throughout all of the assault and the injuries the victim was alive.

The defendant, in describing the events of the murder, said he first struck the victim in the face with his fists, then beat her with a pipe, and then got out a knife which he said was to cut a cord from around her throat in which she had become entangled during the assault, but which we determine to be the time he inflicted the cuts on her throat and pubic area. *The defendant described the victim as struggling and screaming throughout the assault.*

The evidence of the crime scene shows the assault and murder occurred in the kitchen of the victim's home in which there was evidence of the victim's blood in various areas of that room on furniture and appliances and in the area of the body, further evidencing the struggle that had occurred.

The panel finds from the evidence beyond a reasonable doubt that the murder of Alice Singleton was especially heinous, atrocious and cruel in that *she was subjected to the imposition of extreme suffering by the defendant prior to her death, all as demonstrated by the nature of the injuries described above, the manner of their infliction, and her being alive and conscious during most if not all of the assault.* Therefore, the panel finds that this prong of this aggravating circumstance exists beyond a reasonable doubt.

(Emphasis supplied.)

In order for aggravating circumstance (1)(d) of § 29-2523 to be present, the method of killing must entail something more than the ordinary circumstances that attend any death-dealing violence. *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989).

We agree with the sentencing panel's conclusion that the victim was forced to undergo extreme suffering before she died. This was a brutal, painful, and ruthless crime. The victim, a small 82-year-old woman, was repeatedly struck by the defendant with his fist and with an 8- to 10-inch pipe. She suffered substantial injuries to her head and face as well as 14 broken ribs. By the defendant's own admission, the victim was conscious and struggling during this painful ordeal. While not admitting to cutting the victim, Victor admitted that while he was using his knife, the victim was alive and screaming. Dr. Roffman concluded that all of the victim's injuries occurred before the victim died, although he could not conclude in what particular order. The victim's blood was found on a kitchen counter, a utility stand, a door, table legs, a light switch, a shoe, and an iron. There was a significant pool of blood on the floor some distance from the body. The victim was not only brutally beaten while she was conscious, but was also able to watch, struggle, and scream as Victor slashed her throat. The victim lay on her kitchen floor, where she eventually bled to death.

Beyond a reasonable doubt, the victim was subjected to the imposition of extreme suffering by the defendant prior to her death. In addition, the facts and circumstances of this case; the nature, extent, and severity of the victim's injuries; the vicious manner in which they were inflicted over a substantial period of time; and the obvious extent of the struggle that took place also support a finding beyond a reasonable doubt that Singleton was tortured while alive by the defendant. We agree with the sentencing panel's finding that aggravating circumstance (1)(d) did exist.

### 3. Mitigating Circumstance (2)(g)

Defendant also argues the sentencing panel erred in failing to find that mitigating circumstance (2)(g) of § 29-2523 existed. Mitigating circumstance (2)(g) reads: "At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication." Victor contends that he was impaired by alcohol.

The sentencing panel addressed defendant's contention and

made the following findings:

As to intoxication, the murder appears to have occurred at some time between 4:00 o'clock p.m., when the victim's friend Mrs. Burton dropped the victim off at her home, and 5:52 p.m., when the 911 call was made reporting the murder and the police officer received the call to go to the victim's residence.

Adele Doyle testified that the defendant came to her home on the day of the murder at approximately four o'clock p.m., that he had several beers before arriving, that he refused her offer to drink anything further at her home, that she does not recall his drinking anything, that he smelled of alcohol but was not drunk, and that he left her home at approximately five o'clock p.m. and drove away in his car in a normal manner.

At approximately 7:30 p.m., the defendant's brother-in-law, Fred J. Walker, saw the defendant as he came into Walker's home where he roomed, and told Walker of the victim's death. Walker testified that he was close to the defendant, and, while defendant was visibly upset and agitated, he noted neither the odor of alcohol nor any indication that the defendant was intoxicated.

Defendant's initial statement to the police was that he had picked up a girl friend at about ten o'clock a.m., that they drove around, that he purchased a six-pack of beer while driving around and that he dropped his girl friend off around 3:30 to 4:00 o'clock p.m. and returned to his residence. In a second statement, the defendant said that at the time he picked his girlfriend up, he bought two beers from a bar, that about 10:45 a.m. he purchased some more beer which they drank and that he dropped his girl friend off at one o'clock and returned to his home.

Later, in his third and now incriminating statement the following questions and answers were given.

Q. Do you know why you did this, Victor?

A. I drank too much.

Q. Think you drank too much?

A. I drank too much.

Q. Do you think you have a problem?

A. Yeah, alcohol - I drank too much 3 - 4 - fifth of wine and three six-pack a day.

We agree with the sentencing panel in its conclusion that mitigating circumstance (2)(g) did not exist. The competent relevant evidence reflects that the defendant's capacity to appreciate the wrongfulness of his conduct or his failure to conform his conduct to the law was not impaired by intoxication. Victor's initial statements about what he consumed the day of the murder were inconsistent and do not deal specifically with the amount he consumed. His last statement that he drank too much is imprecise, conclusory, uncorroborated, and more consistent with his general admission that he had a problem with alcohol. His statements as to his actions in the victim's home are clear and concise and, although in some respects incredible, are not vague and do not suggest that his capacity was impaired by intoxication. This assignment of error is without merit.

We agree with the sentencing panel that no mitigating circumstances set out in § 29-2523(2)(a) to (2)(g) exist. Victor had a significant history of prior criminal activity. There is no evidence that defendant acted other than on his own accord without any outside pressure. We agree with the sentencing panel that defendant was not suffering from any extreme mental or emotional disturbance that influenced him to murder the victim or that the defendant's age had any effect on his conduct. The defendant was the sole actor in the murder, and there is no evidence to support a finding that the victim was a participant in Victor's conduct or consented to the act. Although the sentencing panel gave little weight to the defendant's conduct during previous incarcerations, the panel did consider that conduct as a nonstatutory mitigating circumstance. We also consider such record a mitigating circumstance.

The balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors. *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989); *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986). As we observed in *State v. Stewart*, 197

Neb. 497, 518, 250 N.W.2d 849, 862 (1977), quoting *State v. Dixon*, 283 So. 2d 1 (Fla. 1973):

> "It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present. Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in Furman v. Georgia, supra, can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all."

Having weighed anew the aggravating circumstances and the mitigating circumstances, see *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977), we conclude that, even excluding defendant's manslaughter conviction and giving full weight to Victor's conduct during previous incarcerations, the aggravating circumstances that were proven beyond a reasonable doubt to exist so far outweigh the mitigating circumstance that the imposition of the death penalty was appropriate and not arbitrary.

The assignments of error raised by Victor in regard to the sentence imposed by the sentencing panel have no merit.

### C. Excessiveness of the Sentence

Victor lastly contends the sentencing panel erred in finding that a sentence of death was not disproportionate or excessive.

Neb. Rev. Stat. § 29-2521.03 (Reissue 1989) requires the Supreme Court to determine the propriety of the death sentence in a case in which it has been imposed by comparing the

sentence with previous cases involving the same or similar circumstances.

We have determined that the purpose of that statute is to ensure that no sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances and that the review should include only those cases in which the death penalty was imposed. *State v. Joubert, supra*; *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986).

We have compared the facts and circumstances of this case with those of all the applicable cases in which the death penalty was imposed. We find that the sentence imposed in this case is no greater than, nor disproportionate to, the sentence imposed in any other case with the same or similar circumstances. Defendant's final assignment of error is also without merit.

## III. CONCLUSION

As stated before, this court is charged with the automatic review of all cases in which the death penalty has been imposed. § 29-2525. This court has separately reviewed each of defendant's assignments of error and finds they are meritless.

For the reasons stated, Victor's convictions and his sentence are affirmed.

AFFIRMED.